## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : |
| **v.** | : |
| | :     **Case No. 23-CR-26 (RCL)** |
| **WILLIAM BROCK,** | : |
| also known as "Stu" | : |
| **ANTHONY ANTWON MCNAIR JR.,** | : |
| also known as "Mousey" | : |
| **ERIN Sheffey** | : |
| also known as "Freak", | : |
| | : |
| **Defendants.** | : |

## <u>GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that the defendant ANTHONY ANTWON MCNAIR JR., be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence), and 18 U.S.C. § 3142(f)(1)(E) (a felony involving a firearm) of the federal bail statute.

As discussed further below, the defendant stands charged in this case with one count of Conspiracy to Interfere with Interstate Commerce by Robbery, in violation of Title 18 U.S.C. § 1951, two counts of Interference with Interstate Commerce by Robbery, in violation of Title 18 U.S.C. § 1951, two counts of Bank Robbery, in violation of Title 18 U.S.C. § 2113, and two counts of Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of Title 18 U.S.C. § 924(c)(1)(A)(ii). Defendant McNair played a significant role in the armed and violent robbery of armored trucks in broad daylight and in the armed robbery and beating of a courier on a public street.

McNair is also charged in U.S. District Court for the District of Maryland with the crimes

of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1), Possession with Intent to Distribute Fentanyl, 21 U.S.C. § 841(a)(1) and (b)(1)(B), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c), all of this conduct related to a traffic stop on April 21, 2022. In the Maryland case, McNair is detained pending trial and is in federal custody on that case. McNair is a danger to our community and no conditions of release can keep our community safe were he to be released.

The government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

## FACTUAL BACKGROUND

This case involves three robberies of Brinks armored trucks in October and December 2021, and March 2022.  All three robberies occurred at the same time (around 9:00 AM), on the same day (Wednesday), and targeted a Brinks armored truck.  In all three, the robbers arrived prior to the Brinks truck and laid in wait, suggesting they had surveilled the driver's route on previous occasions.  In the first and second robberies, the same Brinks driver was targeted and assaulted. The first and third robberies occurred at the same location.  Additionally, in the first and third robberies, the robbers used stolen vehicles as getaway cars before abandoning and burning those vehicles.  The government anticipates proving at trial that defendant McNair entered into a conspiracy with codefendants Brock, Sheffey, and others, and played a central role in the October 6, 2021 and December 8, 2021 robbery.

### *The October 6, 2021 Robbery*

On October 6, 2021, at approximately 9:30 a.m., a Brinks armored truck driver was robbed by four men while the truck was parked in front of SunTrust Bank at 1340 Good Hope Road

2

Southeast, Washington, D.C.

Having conducted surveillance prior to the robbery, the robbers lay in wait for the Brinks armored car to arrive. Four of the robbers arrived in a dark blue Infiniti SUV, which had been stolen in the overnight period of September 6-7, 2021. A separate lookout, identified as Defendant Brock, arrived at the robbery location at 8:34 a.m. on foot, and took up a position at a bus stop at 8:38 a.m. The three robbers who arrived in the Infiniti SUV arrived at 8:46 a.m. They lay in wait for approximately 30 minutes prior to the arrival of the Brinks armored car.



*Figure 1, Showing the Infiniti SUV (Yellow Circle) in Position Since 8:46 A.M., Waiting for The Arrival of The Brinks Armored Car (In Blue) As It Drives to the Bank At 9:23 A.M.*

The subjects, who were armed with long guns, waited for the driver of the car to unlock the car and then sprang into action as depicted in *Figures 2 and 3.*

3



*Figure 2, Showing an Armed Robber (Yellow Circle) Sprint Across the Street to Attack the Brinks Armored Car (In Blue) as it Opens its Doors in Front of the Bank at 9:24 a.m.*



*Figure 3, Showing the 2ⁿᵈ and 3ʳᵈ Armed Robber (Red and Green Circle) Sprint Across the Street to support the 1ˢᵗ Robber (in Yellow) who is Already Assaulting the Driver.*

Video recordings, taken from the armored car, also show the armed robbery. In *Figure 4,* the Brinks driver is seen walking with a delivery bag as a robber arrives, brandishing a firearm.



*Figure 4, Showing 1st Armed Robber Brandish a Firearm and Sprint Towards the Delivery Driver.*

The armed robbers beat the driver and stole his courier bag *Figure 5.* As that robber took the bag and ran back to the getaway vehicle, another robber, depicted in *Figure 6,* stole the delivery driver's firearm.



*Figure 5 (left) Showing the Beating and Theft of the Courier Bag, and Figure 6 (right) Showing the theft of the Courier's Firearm.*

5

They beat the driver and stole from him a courier bag containing $103,800. The robbers also stole the firearm belonging to the Brinks driver. A fourth subject stayed in the stolen Infinity SUV, which fled the scene following the robbery, after it picked the other three up. In all, from the moment the robbers first demonstrated force against the driver, until they were all back in the car fleeing the scene, only 45 seconds elapsed.

In addition to the Infinity SUV, the robbery team used a black Dodge Charger as a clean car to facilitate their escape. The escape route of the Infinity SUV, as well as the black Dodge Charger was video recorded by MPD crime cameras, three residential cameras along their escape path, as well as from surveillance video from near the Anacostia Metro station. This video surveillance tracks the getaway vehicles along the escape route, to an area approximately 1/2 mile away, where the dark blue Infiniti SUV was abandoned. As it was abandoned, it had the center of the dashboard area and infotainment system and associated electronics set on fire.

Surveillance video also captures Defendant Brock, who had been a lookout, as he was picked up by a gold Infiniti sedan from his lookout location. Records from GPS monitoring of Defendant Brock, who was placed on monitoring by the Court Services and Offender Supervision Agency (CSOSA) for post-trial supervision confirm both the identity of Defendant Brock as well as his location as look out before and during, as well as his escape path after the robbery. Together, the video and GPS data show, in the moments while Defendant Brock is being picked up by the gold Infiniti sedan near the robbery location, Defendant McNair, who left the abandoned Infinity SUV, is on foot, walking to a link-up point to be picked up by Defendant Brock. At 9:29 a.m. McNair is captured by surveillance video with audio, as depicted in *Figure 7,* walking and making a phone call where he yells "Hurry up Bro!" into a phone.



*Figure 7, Defendant McNair Walking, After Having Just Made the Phone Call to Defendant Brock.*

Phone records of Defendant Brock confirm this phone call. The records show Brock's telephone number, 202-820-2150, receives a call from 202-235-4875 at 9:29 a.m. which was approximately 13 seconds in duration. This call matches the timing of the phone call made by McNair. Verizon cellular tower data reveals the phone McNair called from, x4875 used a cellphone tower in proximity to the location where the Infiniti SUV was found abandoned and set on fire and where the video surveillance footage captured McNair walking and making the phone call. CSOSA records attribute both numbers x4875 and x2150 to Brock. The same number, 202-235-4875, is saved in one of Brock's seized cellular devices as a contact labeled "My Other Phone." This supports the inference that prior to the robbery, Brock provided McNair his second phone to effectuate the pick-up after the robbery as part of their plan.

Brock, now a passenger in the Gold Infiniti sedan, picked up McNair near the intersection of Shannon Place Southeast and W Street Southeast, at 9:36 a.m. as captured in *Figure 8* below. Not only is this confirmed by video surveillance, it is also confirmed by Brock's GPS monitoring.



*Figure 8, video footage of McNair entering Gold Infiniti Sedan.*

At 9:49 a.m., according to both cell site location data as well as Brock's GPS records from CSOSA, the Gold Infinity sedan arrives at a specific address in the 2300 block of Skyland Terrace Southeast. This is Anthony McNairs known address.

The getaway car, the Infinity QX60 SUV was processed for evidence by the FBI evidence response team, to conduct DNA examinations among other forensic testing. In addition to a DNA swab of the front passenger area of the car, that supported a very strong support for defendant Brock's inclusion in that profile, DNA matching Defendant McNair was found. A DNA analysis of a swab of a sweatshirt recovered from the car, depicted in *Figure 9,* provided a very strong support for McNair's inclusion as a contributor.[1]

---

[1] Specifically, the DNA analysis reflected that Male DNA was obtained from swab of the sweatshirt. The DNA profile was interpreted as originating from three individuals. The DNA results from the swab of the sweatshirt are 1.7 sextillion times more likely if McNair and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors. The FBI's qualitative scale indicates that this is very strong support for inclusion. This is the highest level of inclusion and applies to any ratio greater than one million.



*Figure 9, sweatshirt with DNA matching McNair's profile*

In addition to the evidence above, at trial, the government expects to link codefendants Brock and McNair to the crime through witness testimony of individuals with personal knowledge of the crimes and its planning, surveillance video, GPS data obtained from codefendant Brock, phone call records between codefendants, and forensic DNA evidence tying both codefendants Brock and McNair to the escape vehicle.

### *The December 8, 2021 Robbery*

On December 8, 2021, the same Brinks truck driver involved in the October robbery was assaulted and robbed in the 2900 block of Minnesota Avenue Southeast as he was conducting a pickup of checks from a parts store to deposit at a local bank.[2]  At least two witnesses will identify codefendants Brock and McNair as the two men involved in the assault and robbery. According to video footage from the security cameras, Brock and McNair arrived well ahead of the Brinks truck

---

[2] The location of this robbery is approximately 1.3 miles away or a six-minute drive from the location of the October and March robberies.

and parked in the rear parking lot, arriving at 8:18 a.m. They lay in wait for 36 minutes prior to the arrival of the Brinks truck, supporting the inference, confirmed through evidence obtained from a search warrant executed on Brock's iCloud account, and through the testimony of expected witnesses with personal knowledge of the planning, that Brock had done surveillance in advance of the robberies.

At 8:55 a.m., Defendants Brock and McNair walked through the rear of the Parts Authority store parking lot, as captured on security footage in *Figure 10.* They then turn the corner and walk towards the armored car and main store entrance as depicted in *Figure 11.*



*Figure 10, Showing Defendants Brock (left) and McNair (right) Walking Through Parking Lot, Just as the Brinks Armored Car Arrived*



*Figure 11, Showing Defendants Brock (left) and McNair (right) Immediately Prior to the Brinks Driver Exiting the Armored Car*

Defendant McNair enters the store, as defendant Brock continues down the street, as they wait for the Brinks driver to exit the armored car. Moments after the driver exits, *Figure 12,* they attack, as depicted in *Figures 13 and 14*, with weapons brandished.



*Figure 12, The Unsuspecting Driver Walks to Store*



*Figure 13, Brock Brandishes a Firearm, while McNair is Just Inside the Store Having Taken the Drivers Courier Bag*



*Figure 14, McNair (right) with Weapon Drawn, Takes the Courier Bag, While Brock Tries to Steal the Drivers Weapon; Members of the Public in Background Flee*

The two assaulted the driver, with McNair stealing the driver's courier bag while Brock searched the driver's pockets and attempted to steal his firearm.   Brock hit the driver in the head with his gun before fleeing as depicted in *Figure 15*. The driver suffered significant injuries as a result of being assaulted, requiring surgery. As the driver had not yet picked up the checks from inside the store, the courier bag was empty, and no money was stolen.



*Figure 15, Defendant Brock Pistol Whipping the Defenseless Security Guard*

At trial, the government expects to link codefendants Brock and McNair to the crime through witness testimony of individuals with personal knowledge of the crimes and its planning, and surveillance video where the subjects can be identified and statements of codefendants acknowledging their participation to cooperating witnesses.

### **The March 2, 2022 Robbery**

On March 2, 2022, an armed robbery occurred of a Brinks Armored Car.   At approximately 8:56 a.m., a dark SUV pulled up and parked at the northwest corner of 14th Street and Good Hope

Road Southeast, facing the Truist Bank.[3]   No one exited the vehicle.   Instead, the vehicle waited for a Brinks truck to arrive.

Shortly after, a man wearing a black hoodie, a light-colored vest, and tan shoes/boots approached the corner and sat on the ground at a bus stop located just outside the passenger's side of the dark SUV as depicted in *Figure 16*.



*Figure 16 – A Still Image of Video Footage Showing Dark SUV (In Yellow) that arrived approximately 9 min prior to the Brinks Armored Truck and Man in Yellow Vest (in Red)*

---

[3] This is the same location as the October robbery, but the bank's ownership changed from SunTrust to Truist.

At approximately 9:04 a.m., a Brinks armored truck drove into the 1300 block of Good Hope Road Southeast and parked in front of the Truist Bank. The position of the dark SUV and the Brinks Armored Truck is depicted in *Figure 17*.



*Figure 17 – A Still Image of Video Footage Showing Dark SUV (in Yellow), Man in Yellow Vest (in Red) and Brinks Armored Truck (in Blue)*

Shortly after, a passenger in the Brinks armored truck got out. The dark SUV then drove to the rear of the Brinks truck. At the same time, the armed robbers moved quickly towards the Brinks truck, as depicted in *Figures 18.*



*Figure 18 – A Still Image of Video Footage Showing the Moment the Brinks Guard Exited the Armored Car, the Armed Robbers Sprang into Action*

At once, the armed robbers struck from three different angles. The dark SUV pulled to the rear of the Brinks Armored Car, the Man in the Yellow Vest walked along the sidewalk, and another armed robber took a position to the front of the vehicle, striking from the left.



*Figure 19 – A Still Image of Video Footage Showing the Armed Robbery Participants, the Dark SUV (In Yellow) the Man in the Yellow Vest (In Red), and the Point Man Striking from the Front Left (In Orange)*



*Figure 20 – A Still Image of Video Footage from Inside the Brinks Armored Truck Showing the Armed Robber Striking from the Front Left of the Vehicle (In Orange)*

Before the victims could react, another subject with a long arm weapon exited the passenger's side of the SUV and ran up to the passenger's side of the Brinks truck.

\* \* \*



*Figure 21 – A Still Image of Video Footage Showing the subject with a long arm weapon exiting the passenger's side of the SUV (in Green)*

One subject, armed with a handgun, entered the truck, pointed the handgun at the driver, grabbed and handed multiple bags of U.S. currency to another subject just outside the truck, who carried them back to the dark SUV.   Surveillance video from the armed robber entering and brandishing a firearm is depicted in *Figures 22 and 23* below.

\* \* \*



*Figure 22 – A Still Image from Video Footage inside the Brinks Armored Truck Showing an Armed Robber Brandishing a Handgun (in Yellow) at a Brinks Driver*



*Figure 23 – Showing an armed robber with a handgun (in yellow) and an armed robber with a long gun (in Green)*

The subjects then fled in the dark SUV, stealing more than $1 million. Less than 45 seconds after springing into action and showing force, the armed robbers departed the scene. The dark Honda Pilot SUV drove off at approximately 9:06 a.m.

Following the robbery, at approximately 9:12 a.m., a witness called 911 to report suspicious activity around the 2500 block of Naylor Road Southeast, which is an approximately 4-minute, one mile drive from the robbery location. This witness heard a loud noise, consistent with car doors slamming, coming from the alley in the rear of the building. The witness looked outside and saw four subjects standing around a parked car, which was later determined to be the same dark SUV. The witness saw that all four subjects were wearing dark clothing and face masks and one subject was wearing a bright colored construction vest. The witness saw the four subjects walk away from the dark SUV. One was carrying what appeared to the caller as a machine gun and another was carrying what appeared to be a dark plastic bin.

This witness then saw three of the four subjects standing near a dumpster located at the rear of 2420 T Street Southeast. The witness observed a fourth subject standing at the end of the alley that intersects with the 2400 block of S Street Southeast. The witness stated when the fourth subject was at the end of the alley, the subject motioned with his hands. The witness then observed a four-door sedan enter the alley from the location where the fourth subject was motioning. The witness further stated that all four subjects then entered the four-door sedan and fled the area.

When law enforcement searched the area around and behind 2500 Naylor Road Southeast, they found the dark SUV, which was a Honda Pilot that was previously reported stolen in Montgomery County between the February 28 and March 1, 2022, as depicted in *Figure 24*. Law enforcement also found an AR-style firearm underneath a dumpster located in the rear of 2420 T Street Southeast as depicted in *Figure 25*. This firearm was tested by the Firearms and Toolmarks

division of the Federal Bureau of Investigation Laboratory in Quantico, Virginia, and was confirmed

as a 5.56 x 45-millimeter (.223 Remington caliber) Anderson Manufacturing pistol, model AM-15,

which functioned as a firearm when tested.



*Figure 24 – A Photograph of the Abandoned Dark SUV used in the Robbery, a Honda Pilot Stolen the Late Night/ Early Morning the Day Before the Robbery*

\* \* \*



*Figure 25 – A Photograph of the AR-style Firearm Underneath a Dumpster Near the Abandoned SUV*

Law enforcement searched the dark SUV and found a plastic bag on the center console and money wrappers consistent with those used by Brinks on the floorboard.   Codefendant Brock's fingerprints were on both items.



*Figure 26 – A Photograph of the Money Wrapper found in the Honda Pilot That Contained Codefendant Brock's Fingerprint*

Other evidence collected from the vehicle used to escape the March 2, 2022, armed robbery was sent to the FBI laboratory at Quantico, VA for forensic examination.   The 2019 Honda Pilot

was swabbed by the FBI evidence response team to conduct DNA examination.   A DNA profile was developed from a swab of the steering wheel.   A comparison of that profile to a profile of Defendant Sheffey indicated very strong support for his inclusion in that profile.[4]

Other items besides plastic bags and money wrappers were found in the vehicle. A yellow vest was found in the vehicle as depicted in *Figure 26.* The FBI performed DNA analysis on this vest and found moderate support for the inclusion of Defendant Sheffey.[5]



*Figure 26 – A Photograph of the Yellow Vest Found in the Honda Pilot that Contained a DNA Profile with a Moderate Level of Support for Including Sheffey*

---

[4] Specifically, the DNA analysis reflected that Male DNA was obtained from swab of the steering wheel. The DNA profile was interpreted as originating from four individuals. The DNA results from the swab of the steering wheel are 12 quintillion times more likely if Sheffey and three unknown, unrelated people are contributors than if four unknown, unrelated people are contributors. The FBI's qualitative scale indicates that this is very strong support for inclusion. This is the highest level of inclusion and applies to any ratio greater than one million.

[5] Specifically, the DNA analysis reflects that male DNA was obtained from the vest.   The profile obtained from the vest was interpreted as originating from three individuals. This DNA profile was 6,400 times more likely if Sheffey and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors. The FBI's qualitative scale indicates that this is moderate support for inclusion.

### *Use of the Illicit Proceeds*

Following the March robbery, Sheffey and other co-conspirators used funds from the robbery to travel to Los Angeles, California.   The purpose of this trip was to make connections with drug wholesalers and purchase drugs for distribution in Washington, D.C.   Sheffey and other co-conspirators stayed at a luxury rental property which cost thousands of dollars a night.   The trip was documented on Sheffey and other co-conspirators' social media.   Those images reflect the co-conspirators displaying significant amounts of cash.   In sum, the government will show that Defendant Sheffey and his co-conspirators intended to use the proceeds of the armed robberies to fund an expansion into other criminal enterprises.

### *Defendant McNair's Superior Court Arrest for Second Degree Murder While Armed*

In addition to the conduct noted above, Defendant's MacNair's direct participation in the October 2021 and November 2021 robberies, and his liability as a co-conspirator for the March 2022 robbery, McNair is also pending charges for unrelated conduct. His charges in U.S. District Court for the District of Maryland for being a Felon in Possession of a Firearm, Possession with Intent to Distribute Fentanyl, and Possession of a Firearm in Furtherance of a Drug Trafficking Offense. All of this misconduct relates to a traffic stop conducted in Maryland in on April 21, 2022, are still pending. Defendant McNair is detained pending trial in that case and is in the custody of the Attorney General.

### **ARGUMENT**

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C.

§ 3142(e).   The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community.   *See id.* As is relevant to this case, the Act provides rebuttable presumptions for cases where there is probable cause to believe that the defendant committed an offense under 18 U.S.C. § 924(c). *Id.* § 3142(e)(3)(A), (C). "For purposes of making that determination, a grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *United States v. Taylor*, 289 F. Supp. 3d 55, 62–63 (D.D.C. 2018) (internal quotations omitted).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors:   (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f).   Specifically, the presentation of hearsay evidence is permitted and the government may proceed by proffer.   *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."   *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986).   *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).   A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues.   *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

26

Because Defendant McNair is charged with a violation of 18 U.S.C. 924(c), the Court must presume that no condition or combination of conditions will reasonably assure the safety of the community. A review of the 3142(g) factors makes clear that the Defendant cannot overcome these presumptions. Simply put, Defendant McNair has demonstrated his capability and willingness to conduct brazen armed robberies and to transport fentanyl, a leading cause of overdoses leading to death. He represents a danger to our community and should be detained pending trial.

## I.   THE NATURE AND CIRCUMSTANCES OF THESE OFFENSES MERIT DETENTION.

The first factor to be considered, the nature and circumstances of the offenses charged, weighs heavily in favor of detention.

The defendant conspired with others to engage in a series of highly planned armed robberies. Every one of these robberies—which targeted armored trucks with armed guards—necessarily required firearms.   In other words, each conspirator planned for the possibility of deadly force.   In fact, during the first two of the robberies, Defendant McNair and his conspirators used firearms to assault and beat the armored truck driver.

As described by Judge Berman Jackson in *United States v. Lee*, "[t]he best outcome, if everything goes as planned during an armed robbery, involves a victim's being placed at risk and feeling terrified for his safety, possibly for years to come, and if things go wrong, someone—or multiple people—could be killed or seriously injured." 195 F.Supp.3d 120, 129 (D.D.C. 2016) (finding the nature and circumstances weighing heavily in favor of detention in a case where a single Hobbs Act robbery was charged).   This was not just one armed robbery, it was three armed robberies.   Each the results of months of planning and coordination.   In each robbery, Defendant McNair and his conspirators arrived and lay in wait at a designated stop on these truck drivers'

routes.   As soon as the driver opened the door, they sprang into action with a well-coordinated, well-timed, and inherently dangerous act – brandishing firearms against armed security guards and aiming their firearms inches from the heads of their victims. Each time, they did this in broad daylight, on Wednesday mornings, during morning rush hour.   As members of our community were going to school, arriving at work, or commuting, Mr. McNair and his co-conspirators committed intensely hostile and violent acts – one more apt to be depicted in a violent movie scene than occurring on the streets of our community. This factor weighs heavily in favor of detention.

## II.      THE WEIGHT OF THE EVIDENCE IS STRONG.

At trial, the Government anticipates that multiple witnesses will testify based on first-hand knowledge as to MacNair's role in these offenses. This testimony will be corroborated by evidence including video surveillance footage, phone records, Brock's GPS monitoring, social media, including the aforementioned evidencing his co-conspirators detailing the trip to L.A. and compelling forensic evidence tying McNair to the March 2022 robbery. This combination of witness testimony, corroborated by electronic records and forensic evidence, is formidable and justifies pre-trial detention.

## III.     THE DEFENDANT'S HISTORY AND CHARACTERISTICS MERIT DETENTION.

The third factor, the defendant's history and characteristics, weighs heavily in favor of detention. Mr. McNair has been indicted in two separate and serious offenses.   In addition to the offense with which he is charged here, and his U.S. District Court in Maryland charges, McNair has other prior convictions, including a Conviction in D.C. Superior Court Case 2013 CDC 018383 for Lewd, Indecent, or Obscene Acts a conviction where he received 30 days confinement, and a conviction in 2006 CF2 025087 for Attempted Robbery where he received 24 months incarceration.

The defendant's history and characteristics weigh in favor of detention in this case.

## IV.    MCNAIR PRESENTS A DANGER TO OUR COMMUNITY.

In the present case, his actions in participating in an armed robbery with weapons, robbing armed security guards in broad daylight on a busy street in Washington, D.C. demonstrate a total disregard for the safety of the community. In his other pending case, he is charged with the distribution of fentanyl[6], a substance wreaking havoc in U.S. cities. His past criminal conviction for attempted armed robbery shows previous sentences have not deterred him. He has been previously found guilty of serious crime and sentenced, only to commit further crime after release.

The defendant is a classic case of the type of dangerous person the Bail Reform Act seeks to protect the public from, an individual who has shown the willingness and capability to engage in violence and in highly dangerous acts that can result in lost human life. There are no conditions or combination of conditions apart from detention that can guarantee the safety of the community. The government believes the defendant poses a severe danger to the community and should be detained pending trial.

---

[6] The statistics regarding the dangers of fentanyl are staggering:
- In Maryland in 2020, there were 803 firearms deaths (CDC); but 2,342 fentanyl related deaths (Maryland Department of Health Annual Report).
- In DC in 2019, there were 141 firearms deaths (Johns Hopkins); but 257 Fentanyl related deaths (DC Office of the Chief Medical Examiner).
- 95% of opioid overdoses in DC in 2021 involved fentanyl (DC Office of the Chief Medical Examiner).

**<u>CONCLUSION</u>**

At any hearing in this matter, the government respectfully requests that the Court issue an

Order granting its motion that the defendant be held without bond pending trial.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:          _/s/ Alexander R. Schneider_
ALEXANDER R. SCHNEIDER
Special Assistant U.S. Attorney
Michigan Bar No. P71467
601 D Street, N.W.
Washington, D.C. 20530
alexander.schneider@usdoj.gov
(202) 252-7124