UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | Case No. 23-CR-26 (RCL) |
| **WILLIAM BROCK,** | : | |
| also known as "Stu" | : | |
| **ANTHONY ANTWON MCNAIR JR.,** | : | |
| also known as "Mousey" | : | |
| **ERIN SHEFFEY** | : | |
| also known as "Freak", | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Mr. Anthony McNair comes before the Court after a jury of his peers found him guilty for robbing at least two armored trucks while armed in broad daylight. Mr. McNair played a singularly violent role in these offenses, assaulting the driver in both robberies. Notably, in the only robbery that Mr. McNair was not charged, the drivers were not violently assaulted. Mr. McNair's violent role in these offenses follows decades of crimes that he has committed in our community. Many of those offenses involved significant acts of violence. Even after being caught and charged in this offense, Mr. McNair's crimes continued. He threatened two different witnesses even after this Court intervened to stop him. Mr. McNair is a singularly violent, dangerous, and unrepentant man. For all of the following reasons, the Government recommends that the Court sentence Mr. McNair to a total term of imprisonment of forty years, followed by three-years of supervised release. This sentence represents an upward variance reflecting the extraordinary lengths Mr. McNair went to intimidate witnesses in this case to avoid the consequences of his actions even in defiance of this Court's order.

## BACKGROUND

As proven at trial, Mr. McNair voluntarily joined a conspiracy to rob three armored trucks, participating in at least two of those robberies: October 6, 2021 and December 8, 2021. In each of the two robberies, Mr. McNair wielded a gun at an unsuspecting truck driver and beating the driver on both occasions.

### *The October 6, 2021 Robbery*

The first robbery occurred on October 6, 2021. The night before the robbery, as the crew members were huddled in a parking lot, discussing their plans, Brock was working to find an assault rifle they could use during the robbery. *See* ECF 99 at 84-85. The morning of the robbery, as reflected in surveillance video and GPS data, Mr. Brock arrived early, serving as the lookout for his hand-picked crew. Mr. Brock waited until his crew, including Mr. McNair arrived and then briefly left the area while his crew carried out his plans. Mr. N.A. parked the Brinks truck and stepped out. Immediately, Mr. Brock's crew, including Mr. McNair leapt out, knocked him to the ground, and beat him. As reflected in surveillance video, Mr. Brock's crew dragged Mr. N.A. on the ground as they attempted to steal his firearm. The crew stole more than $100,000.

Video recordings, taken from the armored car, also show the armed robbery.



*Figure 1, Showing Armed Robber Brandish a Firearm and Sprint Towards the Delivery Driver.*

The armed robbers beat the driver and stole his courier bag *Figure 2*. As that robber took the bag and ran back to the getaway vehicle, another robber, depicted in *Figure 3,* stole the delivery driver's firearm.



*Figure 2 (left) Showing the Beating and Theft of the Courier Bag, and Figure 3 (right) of the Gun*

Based on surveillance video and cellphone records, Mr. McNair and the others fled. McNair was responsible for destroying the getaway car, parking it and attempting to light it on fire before calling Brock and directing him to pick him up "Hurry up bro." Cellphone records and Mr.

Brock's GPS reflect that Brock and McNair then went to McNair's residence before returning to nearby the offense.

Mr. Gafari met up with Mr. Brock and McNair shortly after the robbery. ECF 101 at 6. Brock and McNair bragged to Gafari: "We did that shit." As they did, they were flashing $100 bills. *Id.* Later that day, McNair bragged about how quickly he had moved on the driver: "I be working. That's what I do." *Id.* at 9. After the robbery, Brock, McNair and others "end[ed] up blowing all the money on buying weed and clothes," and some cars. *Id.* at 11.

In addition to Mr. Gafari's testimony, Mr. McNair was tied to the October offense by surveillance video, cellsite location data, and DNA from the getaway vehicle.

***The December 8, 2021 Robbery***

On December 8, 2021, the same Brinks truck driver involved in the October robbery was assaulted and robbed in the 2900 block of Minnesota Avenue Southeast as he was conducting a pickup of checks from an auto parts store.[1] Brock and McNair were identified at trial in surveillance video by Mr. Gafari. Mr. McNair was identified in grand jury by his cousin Shanell Denny. After Mr. McNair threatened Ms. Denny, she attempted to recant her testimony at trial and was impeached by her prior statements. Additionally, Mr. Gafari testified that Brock had made statements implicating both Brock and McNair in the December robbery.

Brock and McNair arrived well ahead of the Brinks truck and parked in the rear parking lot, arriving at 8:18 AM. This was consistent with the reconnaissance reportedly conducted by Defendant Brock of the Brinks truck route.

At 8:55 AM, Defendants Brock and McNair walked through the rear of the Parts Authority

---

[1] The location of this robbery is approximately 1.3 miles away or a six-minute drive from the location of the October and March robberies.

store parking lot, as captured on security footage in *Figure 4*. They turned the corner and walked towards the armored car and main store entrance as depicted in *Figure 5*.



*Figure 4, Showing Defendants Brock (left) and McNair (right) Walking Through Parking Lot, Just as the Brinks Armored Car Arrived*



*Figure 5, Showing Defendants Brock (left) and McNair (right) Immediately Prior to the Brinks Driver Exiting the Armored Car*

Defendant McNair entered the store, making sure to cover his hand as he opened the door to avoid leaving forensic evidence. Defendant Brock continued down the street, pretending to wait for the crosswalk, as he waited for the Brinks driver N.A. to exit. N.A. exited the vehicle, and Brock and McNair attacked, brandishing firearms.



*Figure 6, The Unsuspecting Driver Walks to Store*



*Figure 7, Brock Brandishes a Firearm, while McNair is Just Inside the Store Having Taken the Driver's Courier Bag*



*Figure 8, McNair (right) with Weapon Drawn, Takes the Courier Bag, While Brock Tries to Steal*

*the Drivers Weapon; Members of the Public in Background Flee*

Brock and McNair assaulted the driver, with McNair stealing the driver's courier bag while Brock searched the driver's pockets and attempted to steal his firearm. Brock hit the driver in the head with his gun before fleeing as depicted in *Figure 15*. Mr. N.A. testified that he suffered a fractured nose and face. ECF 89 at 55-56. He recalled that he was hit so hard that he briefly lost consciousness. *Id.* He testified that he thought he was going to be killed. *Id.* at 57. Mr. N.A.'s significant injuries required surgery. As the driver had not yet picked up the checks from inside the store, the courier bag was empty, and no money was stolen.



*Figure 9, Defendant Brock Pistol Whipping the Defenseless Security Guard*

**<u>Mr. McNair's Obstruction of Justice</u>**

As evidenced at trial, Mr. McNair took extensive steps to obstruct justice in this case, threatening two different witnesses even after the Court intervened.

*First*, as Mr. Gafari testified at trial, and corroborated by surveillance footage and DOC

records, Mr. McNair used his prison detail to attempt to terrorize Mr. Gafari for months. Mr. McNair stood outside Gafari's cell, banging on it, harassing and threatening him. As Mr. Gafari testified, Mr. McNair initially tried to cajole or bribe him out of testifying. When that did not work, Mr. McNair threatened to kill Mr. Gafari. When that did not work, Mr. McNair threatened to kill Gafari's wife and mother. Based on his experience with Mr. McNair, Gafari believed these threats to be deadly serious. Mr. McNair also tainted Mr. Gafari's food, punishing him for daring to tell the truth to law enforcement.

*Second*, once Mr. McNair became aware of Ms. Denny's involvement in the case, he attempted to intimidate her as well, this time with more success than Mr. Gafari. After multiple threats against witnesses and their family members in this case, the Government requested that the Court order the defendants to be segregated into lockdown at the jail and have their tablet and phone privileges revoked except for attorney calls. Despite this court order, Mr. McNair managed to obtain a different inmate's tablet and called Ms. Denny to intimidate her. During that call, as played at trial, Mr. McNair berated Ms. Denny. He also acknowledged that he had been trying to reach out to her previously regarding her testimony through another individual. Mr. McNair's threats to Ms. Denny were particularly potent given previous calls between the two when he indicated that he "want[ed] to know everybody that's telling on," him, and another call in which he repeatedly asked her "do you know who the fuck you talking to?" and threatening to orphan her children. *See* Exhibit 408, Slides 19-20.

While Mr. McNair's threats were not effective at preventing Mr. Gafari from testifying, they were effective against Ms. Denny. As the Court knows, while Ms. Denny had previously agreed to testify, after McNair's threats she refused. The Government was forced to obtain a warrant to secure Ms. Denny's testimony. Even after that, Ms. Denny attempted on the stand to recant. Fortunately,

9

Mr. McNair's attempts to obstruct justice were ineffective as the jury appears to have seen through Mr. McNair's efforts.

## DEFENDANT'S SENTENCING GUIDELINES RANGE

I. <u>**Generally Applicable Legal Principles**</u>

Though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 590 U.S. 38, 49 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As noted:

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3

10

> details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."

U.S.S.G. § 1B1.3, Commentary, Background.

## II. Defendant's Sentencing Guidelines Calculation

### A. Defendant's Criminal History Category

The Government concurs with the United States Probation Offices' assessment of Mr. McNair's criminal history score, as set forth in the Presentence Investigation Report ("PSR"). *See* ECF No. 134 at ¶¶ 70-71. Mr. McNair's criminal history score is 12, placing him in criminal history category V. *Id.*

### B. Total Offense Level

The Government does not concur with the United States Probation Offices' assessment of the Offense Level Computation set forth in the PSR. *Id.* at ¶¶ 39-63.

In calculating the Guidelines for a conspiracy as well as charged substantive offenses, the Guidelines dictate that each completed offense be treated as a separate conspiracy and that each separate conspiracy groups with each completed offense. *See* U.S.S.G. 1B1.2(d).

***The October Robbery Counts (Counts 2 and 3)***

The base offense level for the October robbery is 20. *See* U.S.S.G. § 2B3.1(a). The following Specific Offense Characteristics apply:

- 2B3.1(b)(1)      Property of Financial Institution      +2 points
- 2B3.1(b)(3)      Bodily Injury                          +2 points
- 2B3.1(b)(6)      Firearm Taken                          +1 points
- 2B3.1(b)(7)(C)   Loss > $95,000                         +2 points

Therefore, the total offense level for the October robbery is 27.

*<u>The December Robbery Counts (Count 5)</u>*

The base offense level for the December robbery is 20. *See* U.S.S.G. § 2B3.1(a). The following Specific Offense Characteristics apply:

- 2B3.1(b)(1)        Property of Financial Institution        +2 points
- 2B3.1(b)(3)        Serious Bodily Injury                    +4 points
- 2B3.1(b)(6)        Firearm Taken                            +1 points

Therefore, the total offense level for the October robbery is 27.

*<u>Unit Analysis</u>*

The highest offense level is 27. Each grouped offense is either equally serious or 1 to 4 levels less serious. Therefore, two levels are added, resulting in a combined offense level of 29.

One enhancement applies to this combined offense level based on Mr. McNair's conduct.

*<u>Adjustment for Obstruction of Justice</u>*

Mr. McNair willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense; therefore, two levels should be added. *See* USSG §3C1.1. Application Note 4, provides examples of covered conduct, and includes "(A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;" as a non-exhaustive example of covered conduct. As set forth above, Mr. McNair threatened two different of the Government's witnesses: Mr. Gafari and Ms. Denny. Given these efforts, a two-level enhancement should apply.

C. **Sentencing Guidelines**

Mr. McNair's total combined offense level is 31. With a total offense level of 31, and a criminal history category of V, Mr. McNair's guideline imprisonment range is 168-210 months.

Additionally, the guideline sentence for each of Counts 4 and 6, violations of 18 USC § 924(c)(1)(A)(ii) is seven years' imprisonment. Therefore, Mr. McNair's total Guideline range is 168 to 210 months plus fourteen years of imprisonment.

## SENTENCING ARGUMENT

When determining the appropriate sentence, the District Court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). See *United States v. Gall*, 552 U.S. 38, 49-50 (2007). The listed factors in 18 U.S.C. § 3553(a) include: (1) the nature and circumstances of the offense; (2) The history and characteristics of the defendant; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Under the Sentencing Act, if the district court imposes a sentence above the applicable Sentencing Guidelines range, then it must state 'the specific reason' at the time of sentencing why the defendant's conduct was more harmful or egregious than the typical case. 18 U.S.C. § 3553(c)(2). *United States v. Nicely*, 492 F. App'x 119, 121 (D.C. Cir. 2012).

The Court should sentence Mr. McNair to forty years of imprisonment, followed by three-years of supervised release. This represents approximately a variance of approximately twenty-five percent above the applicable Guidelines range. Such a sentence is appropriate, however, given Mr. McNair's repeated attempts to intimidate witnesses in this case. Not only must Mr. McNair be deterred for a significant period of time, but others in the community should be made aware that

attempts to intimidate witnesses will be met with significant punishment.

### A. Nature and Circumstances of the Offense

The extreme nature and circumstances of this offense have been well established in the trial in this case, but one facet bears an additional highlight. This crime was a well-planned, well-rehearsed, and well-equipped operation to commit an inherently dangerous act. It bore a closer resemblance to a military operation than a crime of opportunity. Members of the conspiracy conducted surveillance. Members of the conspiracy discussed what role they would play – who would attack the driver, who would provide security, who would drive. Members of the conspiracy discussed how they counsel conceal themselves – how could they blend in and wear non-distinctive clothing and uniforms such as the yellow vest. Members of the conspiracy thought through how they were going to arm themselves, what type of weapons they needed – handguns for the drivers and long guns for the street. And why did they need long guns to be pointed at the streets? Had a police officer or bystander tried to intervene, members of this conspiracy wanted to be ready to put that threat down with gunfire before it manifested itself. Those firearms were not props – the extended magazine admitted into evidence loaded with rounds shows you exactly what members of this conspiracy intended to do with the firearms. The members of this conspiracy were able to commit this crime, because this is a crime committed in furtherance of the violent street crew *Choppa City*.

Mr. McNair was a particularly violent member of this conspiracy. He was involved in beating and robbing the driver in both the October and December robbery. Mr. McNair bragged about his role in the robbery and about how quickly he was able to assault the driver in the October robbery. His words, articulated by Mr. Gafari, indicate that he relished the violence which he inflicted upon innocents.

The nature and circumstances of this offense call for a significant term of incarceration.

### B. The History and Characteristics of the Defendant

Mr. McNair has a lengthy history of committing violent crimes against members of our community.

He was first charged as an adult when he was only 16-years-old. There, he committed an armed robbery with a deadly weapon in Prince George's County, Maryland. He was sentenced to two years' imprisonment.

Before he even pled guilty in that case, after failing to appear in Prince George's County, McNair committed another violent crime. McNair robbed a woman of her cellphone in the 1400 block of Good Hope Road Southeast. McNair was ultimately sentenced to a partially suspended sentence, but his probation was revoked after he committed additional offenses.

While on supervised release for his prior violent crimes, McNair committed yet another one. In May 2012, McNair attempted to assist a man fleeing from police. McNair ran full speed at an MPD officer, knocking her to the ground, causing her to hit her head on the ground, and lose consciousness. McNair was sentenced to a significant term of imprisonment.

While incarcerated, Mr. McNair continued to commit crimes. He was charged and convicted of Lewd, Indecent, or Obscene Acts while incarcerated for his assault of a police officer and received an additional term of imprisonment. Indeed, while pending sentencing in this very case, Mr. McNair has continued to commit crimes. After trial in this matter, Mr. McNair brutally and repeatedly stabbed another inmate in the jail in the head, neck, and chest. He is pending sentencing in that matter.

In addition to these convictions, Mr. McNair is still pending trial in federal court in Maryland in relation to his possession of a machine gun and distribution quantities of drugs in April 2022. Evidence of this offense was presented during trial in this matter.

Since he was sixteen, Mr. McNair has preyed on our community. He has assaulted and robbed members of our community. He has dealt drugs in our community. He candidly admitted during the

preparation of the PSR that he has no employment history and supported himself through drug dealing and family support.

His violent and lengthy history indicate that he must be incarcerated for a significant period.

**C. The Need for the Sentenced Imposed.**

Mr. McNair has evidenced that he is an incredibly dangerous and violent man. He is willing to use force to rob members of our community. He is willing to beat helpless delivery drivers simply trying to do their job. He is willing to knock a police officer unconscious to prevent them from doing their duty. He is willing to repeatedly stab a man even while in jail. Even after being caught, he was willing to go to extreme lengths to avoid consequences. For months, he tormented one of the Government's witnesses. Mr. Gafari was trapped in his cell as Mr. McNair taunted, and cajoled, and ultimately threatened him and his family with death. Even after this Court attempted to intervene to stop these threats, Mr. McNair could not be stopped. He somehow obtained a different inmate's tablet and used it to threaten a different witness. And he was effective. His obstruction of justice—in defiance of a court order—must be met with a significant sentence. Our system of justice simply will not function if witnesses to crimes feel that they will not be kept safe. An upward variance for Mr. McNair sends a message that threatening witnesses is not worth the effort.

Mr. McNair is thirty-six years old. He has been committing crimes in our community and in jail for more than twenty years. He has learned absolutely no lesson. He expresses absolutely no remorse. Mr. McNair represents an incredible danger to our community and should be incarcerated for a significant period of time to keep our community safe.

**CONCLUSION**

For all these reasons, the Government recommends that the Court sentence Mr. McNair to forty years of imprisonment, followed by three-years of supervised release.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney
D.C. Bar No. 481866

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. BAR NO. 481052

By: */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
202-258-3515